KELLEY CONSTRUCTION COMPANY, INC. *v.*
WASHINGTON SUBURBAN SANI-
TARY COMMISSION

[No. 416, September Term, 1966.]

242

*Decided June 27, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Edward L. Foster* for appellant.

*Paul T. Sisson,* with whom were *John B. Kenkel* and *Emil A. Nichols* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

Appellant, Kelley Construction Company, Inc., is in the business of constructing underground utilities, such as water and sewer mains and connections. A great deal of its business is with the appellee, Washington Suburban Sanitary Commission, it having done several millions of dollars of work for the appellee in the past.

On November 29, 1960, and again on December 21, 1961, appellant and appellee entered into two contracts, known as Contract No. 2841-W&S, Water and Sewer House Connection Construction, Central Avenue and Area South, Prince George's County, and Contract No. 3278-W&S, Water and Sewer House Connection Construction, Central Avenue and Area South, Prince George's County. These contracts were awarded the appellant through competitive bidding and are for the construction of sewer and water house connections in a large area of

Prince George's County. Pursuant to the first of these contracts, appellant purchased equipment and embarked upon the installation of such sewer and water house connections as were given to him by the appellee's engineers. Each of the above mentioned contracts, although dated at different times, covered a year commencing in the first instance, January 1, 1961, and in the second, January 1, 1962. In both cases, all work started prior to December 31, was to be completed.

The proposal form on Contract No. 2841-W&S, which is a tabulated form giving quantities, unit prices and total prices, shows a total proposal of $173,803. The proposal form on Contract No. 3278-W&S used for the same purpose, shows a total proposal of $206,643.50. The two contracts contain what are known as "Special Provisions," which cover several pages of the contracts, and which are almost identical in nature. The slight differences found in the two contracts in the "Special Provisions" are immaterial.

The appellant regarded these two contracts as giving it the exclusive rights to install all sewer and water house connections in the areas delineated in Prince George's County, Maryland, which areas are substantially the same in both contracts. Shortly after commencing work on the first of these two contracts (No. 2841-W&S), appellant discovered that it was not receiving all of the sewer and water house connections in its exclusive area. Sometime thereafter, the appellee was notified as to appellant's objection, but informed the appellant that it did not have to give it all of these connections. No satisfaction resulted from a conference with the officials of appellee.

Thereafter, on June 27, 1962, appellant filed a bill of complaint in the Circuit Court for Montgomery County praying for construction of the contracts, for an accounting, damages for breach of contract and for the referral of the matter to an auditor or special master. Appellee's demurrer was overruled and it answered the bill on July 23, 1963. At the hearing on June 21, 1966, the court dismissed, without prejudice, appellant's motion, filed March 15, 1966, for reference of the matter to a special auditor or master. Following testimony by the president of the appellant, the chancellor, after argument, granted

the appellee's motion for a directed verdict; [1] from which this appeal has been taken.

At the trial the only testimony offered was that of Mr. Kelley, president of appellant corporation. He testified that he regarded the contracts as exclusive contracts for the installation of all sewer and water house connections in the areas involved. At the hearing before the chancellor much time was consumed with argument to the court upon the interpretation to be given the contracts; that is, whether or not the construction and language of both contracts could reasonably lead to the interpretation that in the area delineated by the contracts the appellant had exclusive right to make all water and sewer house connections; or whether or not the language of ¶ 5 limited the nature of the contract, and if so, to what extent. Appellant took the position that considering the contract as a whole it was reasonable to conclude that the contract was in fact exclusive in nature, limited only by the actual count of sewer and water house connections received by the chief engineer of the appellee and subject to dollar limitations created thereby as spelled out in ¶ 5. The appellee took the position that ¶ 5 gave the right to appellee to reduce the amount of the contract by any sum.

It is provided in ¶ 1 of the "Special Provisions" of the contracts, that in the case of conflict with the "General Provisions" [2] of the contracts, the "Special Provisions" shall prevail; since the hub around which the argument of both parties revolves is ¶ 5 of the "Special Provisions," we set it forth *in toto*:

---

1. Counsel for both parties and the chancellor for the court below referred to the motion as a motion for a directed verdict. However, the correct designation should have been motion to dismiss. Rule 535. See Reese v. Reese, 239 Md. 639, 212 A. 2d 468 (1965), where under this rule the motion for directed verdict was treated as a motion to dismiss.

2. The general purpose of the contracts is set forth in the contracts as follows: "NOW THEREFORE, THIS CONTRACT WITNESSETH, That the Contractor doth hereby covenant and agree with the Commission that he will well and faithfully construct said water & sewer conns. in accordance with each and every one of the conditions, covenants, stipulations, terms and provisions contained in the above mentioned General Specifications, Standard Details and Special Provisions * * *."

"*APPROXIMATE QUANTITIES.* 5. The quantities of the various items as shown on the proposal form have been estimated, using the best information available, and are approximate only. The Contractor is advised that the quantity of any single item may be increased or decreased in any amount. The total value of the contract may be increased by 50 percent, or may be decreased in any amount, as the interest of the Commission may require; and the Contractor shall not be entitled to any additional compensation, for loss of anticipated profits or for any other reason, over the unit prices bid for the number of units actually used."

One of the requirements imposed upon the successful bidder was the furnishing of a performance bond running in favor of the appellee in a sum equal to 100% of the amount of his proposal and accordingly the appellant posted two bonds totaling $380,446.60.

To understand the cause of the contention between the parties it is necessary to be familiar with the difference between water and sewer main lines and water and sewer house connections. Water and sewer main lines are what their names connote; they carry the water and sewage for comparatively long distances and usually are installed in the bed of the street running parallel to the property lines of the property owners. A water or sewer house connection is connected to the main line but runs at a right angle to it in the direction of the property line of the property owner and usually stops at the property line.

When a sewer or water main line is laid, it is necessary to excavate a ditch or trench in which to lay the main after which the ditch or trench is backfilled. Should water or sewer connections be desired where the main line parallels property that is improved, it is naturally more expeditious and less expensive to make the house connections while the main line is still uncovered prior to backfilling. In areas where real estate subdivisions have prospered and many dwellings are under construction or have been constructed, the appellee found it feasible to have the successful bidder for the water or sewer main line construction also make the house connections. This was one of the areas of dispute between the parties to this case.

The appellee argues that it was less costly to have the main line contractor make house connections at the time of the installation of the main line, rather than to have the appellant go in later and duplicate the original excavations by digging up the backfill to make the house connections onto the main line. It was also argued that two contractors could not work in the same area at the same time, as the main line contractor could not schedule his work so as to accommodate the contractor who may be making the house connections under a separate contract. However, once the main line has been constructed and the backfill completed, the requests for house connections are usually scattered and sporadic.

The chancellor found that the appellant did not have an exclusive right in the area defined in the contracts to install anything, reaching this conclusion from his interpretation of ¶ 5 of the "Special Provisions." The practical effect of such an interpretation is to hold that the appellee had on option on the services of the appellant at a preagreed unit price, if they chose to use its services; and we might add, an option which, according to the appellee, was binding on the appellant although without any consideration moving from the appellee to the appellant.

Counterposed to this, the appellant contends that it had the exclusive right to install all water and sewer house connections, not only those represented by scattered and sporadic requests, but those germane and incidental to main line construction and which were normally accomplished as the main line contractor completed the laying of a specific section of the line and prior to backfilling.

The chancellor made an informed effort to interpret ¶ 5 of the "Special Provisions," and although it is true that under the terms of the contract itself any conflict between the general terms of the contract and the "Special Provisions" are to be resolved in favor of the "Special Provisions," such a principle of construction does not prevent the Court from attempting to reconcile a "Special Provision" with the general purpose of the contract. Judge Barnes, speaking for this Court in *Cadem v. Nanna,* 243 Md. 536, 221 A. 2d 703, (1966), restated one of

the primary rules of construction of a contract where ambiguity is present, stating at p. 544:

> "In the first place, the courts will prefer a construction which will make the contract effective rather than one which will make it illusory or unenforceable. See *Born v. Hammond,* 218 Md. 184, 189, 146 A. 2d 44, 47 (1958)."

Also, the chancellor's interpretation of ¶ 5 places it not only in conflict with the "General Provisions" of the contract but also places it in conflict with ¶ 4 of the "Special Provisions," which we shall discuss later in this opinion.

The appellee contends that the interpretation given the contract by the appellant is a self-serving, unilateral construction, and as was found by the chancellor, untenable. However, let us consider the conclusions we must adopt if we are to accept the lower court's interpretation. It requires us to conclude that the appellant went through the effort of obtaining two substantial performance bonds in the aggregate amount of $380,446.60 and purchased additional equipment to do the job, according to the undisputed testimony of its president, all on the bare hope that the appellee, although not obligated to do so, might favor it with work, which in turn, it would be obligated to perform at the preagreed unit price per connection. We submit that such an interpretation would deprive the contract of any semblance of mutuality. In fact there would be no contract at all; as far as the appellant would be concerned, the whole matter for which he bargained would be illusory.

This Court in *Hendler Creamery Co. v. Lillich,* 152 Md. 190, 136 A. 631 (1927), dealt with a situation which illustrates that the courts will search to find mutuality. Hendler had installed refrigeration equipment at its expense in the Lillich pharmacy and Lillich had agreed to handle Hendler products exclusively for a period of three years. After a year Lillich commenced selling other brands of ice cream and Hendler sought to enjoin Lillich. Lillich, in defense, argued that the contract was void on the grounds of lack of mutuality contending, that although Lillich was obliged to handle Hendler's products to

the exclusion of all others, yet, Hendler was not obligated under the contract to supply Lillich with any creamery products. This Court, speaking through Judge Digges, said at p. 201:

> "At the very least, the contract discloses that there was a proposal by the appellant that the appellee purchase from it certain commodities, which proposal, when accepted by the appellee, carried with it the implied obligation on the part of the appellant to furnish the commodities. In 6 R.C.L. 689, it is said: 'Frequently it happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied.' "

This Court is of the opinion that in the instant case there was a contract.

Indeed the record reveals that the appellant itself conceded that the agreement imposed an obligation upon it. Counsel for the appellee, in arguing the motion for a directed verdict, stated:

> "* * * I do not feel that the plaintiff sustained the burden of proof to warrant the Court to construe this contract other than *a contract for isolated and scattered water and sewer house connections in this particular area based upon the request of the chief engineer to make these connections on existing main line sewer and water lines.*" (Emphasis supplied.)

However, the chancellor in his opinion did not grant the appellant this much, stating:

> "the Court finds that the defendant had the absolute right under the terms of the contract as spelled out in paragraph five to award any work it desired to award

to persons other than the plaintiff in relation to the connection of the sewers and water."

We cannot agree with this construction. We think that had the appellee not given out any work orders for connections, the appellant could not have complained. However, in the event that the appellee did give out work orders or let a contract for house connections, then the appellant under its contract had a right to or at least an interest in such work as spelled out in ¶ 4 of the "Special Provisions."

We hasten to add however, that in the event the appellee awarded any contracts, wherein the general purpose was the installation of water and sewer main lines, and embodied in the same contract and not separately, was a provision for the installation of house connections incident to the main line construction, then the appellee would have had no right to, or interest in, any such work. We say this because the general purpose of the subject contract is house connections *per se* and we do not believe that this carries with it the exclusive right to make such connections when they are part and parcel of a contract which has as its general purpose main line installation. Again, if the house connections are not included in such a contract, as bid and awarded, in conjunction with main line construction, then the appellee would have a right to the work.

Paragraph 5 of the "Special Provisions" cannot be read alone and without reference to the other paragraphs of the "Special Provisions"[3] and in this connection ¶ 4 of the "Special Provisions" is pertinent and reads as follows:

"*TIME PERIOD FOR STARTING AND COMPLETION OF INDIVIDUAL CONNECTIONS.*
4. The Contractor's attention is directed to the fact that the water and/or sewer house connections will be given to the Contractor as received by the Commission

---

**3.** Wheaton Lanes v. Rinaldi, 236 Md. 525, 530-31, 204 A. 2d 537, 540 (1964) and Schapiro v. Jefferson, 203 Md. 372, 378, 100 A. 2d 794, 797 (1953).

and as the Engineer may decide. These orders will not be grouped by localities and the individual house connections must be started within 15 calendar days after issue of said notice. Repeated failure to comply with the above time stated for starting the individual connections will be sufficient cause for cancellation of the contract by the Commission. If the Contractor should fail to start any given connection within 15 calendar days of proper notice, the Engineer shall be and hereby is empowered to have the job done by the Commission's forces or otherwise as he may decide. In the event that the Engineer does have the work done by the Commission's forces, *or others, the Contractor will be paid for the work done at his bid prices and the actual cost of doing the work, including the cost of materials and all overhead charges, as may be determined by the Commission's Treasurer, will be deducted from any monies due the Contractor under the contract."* (Emphasis supplied.)

The language contained in ¶ 4 was never explained or discussed by the appellee or the chancellor, although the natural meaning of the wording would vest the appellee with an interest in those house connections made by the appellee's employees or by third parties at the appellee's request.

Also, this Court cannot disregard the rule of construction of contracts often restated by it, that where an ambiguity exists, a contract will be most strongly construed against the one who prepared it. *Cadem v. Nanna, supra; Hughes & Co. v. Pioneer,* 230 Md. 36, 185 A. 2d 383 (1962) ; *Ebert v. Millers Fire Ins. Co.,* 220 Md. 602, 155 A. 2d 484 (1959) ; *Pulaski v. Riland,* 199 Md. 426, 86 A. 2d 907 (1952). The record reveals that the subject contracts were prepared *in toto* by the legal department of the appellee.

Unfortunately, the record is almost barren of testimony as to how many house connections were made by the appellee or by third parties at the appellee's request, or under what circumstances they may have been made. The appellant's president did testify that one contractor made 48 house connections in

the delineated area, which he thought should have been made by the appellant. However, as to whether these house connections were a part of a contract for installing main lines, we have no way of knowing.

Since we are of the opinion that the agreement which the appellee had with the appellant was more than just an option on the appellant's services to be exercised if and when the appellee deemed it expedient to do so, the chancellor was in error in directing a verdict for the appellee. Accordingly, the case should be reversed and remanded for further proceedings consistent with the holdings of this opinion.

> *Reversed and remanded for further proceedings consistent with this opinion, appellee to pay the costs.*